We're happy to hear argument in our first case, Latson v. Clarke, Mr. Williams. Good morning, your honors, and may it please the court. My name is John Williams and I'm here on behalf of Reginald Cornelius Latson, the appellant in this matter. First off, I would like to reserve three minutes of my time for rebuttal. I don't think the microphone is working. Can anybody hear me? Okay. I want to make sure everyone can hear. Okay. So we move on then. Okay. I'll do my best to speak a little louder. Your honors, there are two primary issues before the court today, qualified immunity as well as an evidentiary ruling that the lower court made regarding the knowledge of Director Clarke, one of the defendants in this matter. I first intend to address the qualified immunity question, but I will spend some time near the end on the evidentiary question that's before the court. So first off, turning to qualified immunity, the issue before this court is whether it was clear just five years ago when Mr. Latson was incarcerated and was the responsibility of the defendants that it was unconstitutional to segregate inmates with mental disabilities or mental illness for extended periods of time and with minimal stimulation available to them. Can I just pause you for a minute? Can people in the back hear? Is the microphone on or not? It's hard for us to tell. You can't hear me. Oh my gosh. They can hear me. First person who's ever said that. Now can you hear? No? Hello? Can you hear now? Okay, fine. I apologize. Give him a few minutes extra. They're my minutes. Thank you, your honor. I appreciate that. So then as now, the actions that I described are unconstitutional and the defendants should not be shielded from qualified immunity. Your honors, Mr. Latson is autistic and intellectually disabled. He had these conditions in 2014 when he was incarcerated and the defendants knew that he had these conditions when they were responsible for Mr. Latson's incarceration and care. There's no dispute about that. But despite knowing that Mr. Latson had these conditions, the defendants segregated Mr. Latson from the wider prison population for lengthy periods of time with significant restrictions to adequate stimulation such as books, radio, other things to entertain himself. Well, but they did that, at least the record suggests, pursuant to a plan that intended to sort of rehabilitate him to improve his conditions as his behavior improved and to treat him all at the same time. And admittedly, during that process, there were periods when because of violations or other circumstances, he was segregated. But I'm not sure that you can legitimately say that he was consistently segregated for no good reason. Your honor, it's correct that there were short periods of time when he was not in some form of segregation. The defendants put him on what is called segregation release plans. Our position on the segregation release plans is that these were kind of rote plans to kind of do the bare minimum to try and get Mr. Latson back into general population. However, these did not take his disabilities into account to any significant measure. And they were, as one of our experts, I believe it was Dr. Vail, stated, the segregation release plans essentially set him up to fail. They did not consider his autism, they did not consider his intellectual disability. And then what happened was Mr. Latson ended up being... Well, but does that suggest that the prison officials in this case weren't acting in good faith, even if they ultimately failed in treating your client's disabilities? Your honor, I think when they don't take his disabilities into consideration, I think you could say that they were not acting in good faith because they had a duty to consider what his disabilities were and consider how his actions could be manifestations of these disabilities. Mr. Latson was not extremely violent. He wasn't committing a lot of self-harm or doing these other things. He did have outbursts. There's no denying that. But what those were were manifestations, quite frankly, of the way that he was being treated at the prison and the way that he was being segregated, in fact, exacerbated that and led to those outbursts. That then, of course, caused him to then fall off of the segregation release plans and it created a whole new cycle of segregation. Can I ask you a question about that? I mean, just in looking at the whole record of this case, there's a way of looking at it where sort of what went wrong was at the very beginning. Like, why is this autistic teenager in the criminal justice system at all? But if he is, and if he is to be in prison, then, I mean, that kind of outburst, sort of from a prison perspective, it is something that has to be dealt with, right? I mean, and we have held that sort of the right justification can justify even solitary confinement. So why at some point don't we have to give some flexibility to the prison officials to deal with the problem that has been created for them? Yeah, of course, Your Honor. And we don't deny that. The prison officials do have some need to deal with prison security, for instance, and protect inmates and prison staff as well. But the way in which they did it was kind of wrote, you know, just sticking to the bare minimum of their policies across the board. It's, you could argue that Mr. Latson even could have been segregated from the larger prison community, even in a cell by himself, but there was no need given his disability. They didn't need to restrict his access to books. They didn't need to restrict his access to a radio or other type of stimulus, which we know specifically are things that someone with autism can use to help cope with things. So there are ways to protect Mr. Latson and protect the greater prison population and deal with things like, such as outbursts or disciplinary issues that still take into account his disabilities and make sure that you're not excessively harming him to the extent that it becomes unconstitutional. But it strikes me that what you're talking about is best practices, right? But are best practices constitutionally required? Your Honor, best practices are not constitutionally required. But what we're, what we're suggesting here is that the, the defendants did what I, you could argue were the bare minimum based on their policies. And you have, what they did not do is to take into account Mr. Latson's particular sensitivities, his, his disabilities that made him particularly susceptible to harm from this type of segregation. I guess I didn't read your complaint. Maybe I missed this. Are you challenging the constitutionality of their policy? I'm sorry, Your Honor, what we're, what we're talking about today is the condition, the conditions in which Mr. Latson was kept. So it's, I guess the, the policies come into play because that's how, that's what, that's what went into what, you know, the reasoning for Mr. Latson being placed in, in segregation or solitary confinement or whatever term you want to use for it. But the, the fact of, the full fact of how he was segregated with, you know, in a small cell, no window, a slot, you know, very limited recreation opportunities, no media, no stimulus or anything like that. When you look at it from a, from a, from as a whole in terms of how he was segregated, that's what we're arguing was unconstitutional. Can I take you back to sort of where you started on this qualified immunity point? So if that's your argument, that's why it's unconstitutional. I mean, it does look like the law in our circuit at the time, not now because we have new cases, but back at the time, the law in our circuit seemed pretty clear that solitary confinement does not satisfy the objective prong of this conditions of confinement analysis. That it's just not sufficient, sufficiently severe of a deprivation. So how do you, what, what do you want us to do with cases like Mickle and Williams? Well, Your Honor, I, I believe that the, the cases in this circuit don't get to the question as to whether solitary confinement for someone with mental health issues or the disabilities of this type. Well, Williams does, right? Well, Your Honor, Williams v. Brinker is a unpublished opinion. Does that matter if the, the, for qualified immunity purposes, right, we're trying, the question is whether the law is clearly established. And if three judges on our circuit thought it went the other way, whether or not they published their opinion, doesn't that sort of show that it was not clearly established in your direction? Your Honor, I think when it, with, with the question in terms of, I apologize, the question is whether the case being published or not goes into the clearly established analysis. There are, um, the, I, I think we have, all right. Um, there, there are, there are cases, I believe the Booker case talks about how unpublished opinions don't, cannot contribute to the concept of clearly established. But the, the, it depends which way you're arguing clearly established, right? An unpublished opinion may not be enough to show that a proposition is clearly established, but an unpublished opinion, um, that is inconsistent with the thing that is said to be clearly established raises some questions, right? So three judges were just out to lunch that day. Sure. So I'll talk a little bit about Williams v. Brinker. Um, first off, the, the prisoner involved in Williams v. Brinker had a serious, lengthy history of self-abuse, behavioral outbursts. I think his, his, uh, conditions were psychotic. I think he had a child. Well, Mr. Williams, I, I guess the problem you have is that if all you're doing is distinguishing Williams, then you've got nothing left in terms of a, a precedent in the Fourth Circuit. And instead, as I had read your brief, you're relying on a couple of Supreme Court dissents. And don't get me wrong, we listened very carefully, paid careful attention to what the Supreme Court said. But you've got that, and, and a smattering of cases, primarily district court cases across the country, that seem to be suggesting a change in the way in which we deal with prisoners with, uh, mental, uh, illnesses and the like. But how does that amount to a robust consensus that these prison officials were required to take into account five years ago? Uh, Your Honor, I think there are two points to make to that. First off, if you, you do look at consensus of persuasive authority when you don't have direct authority in the circuit. And we, we cite a number of cases, including a particular case that actually drew the line between, it, it, prisoners with mental health issues and, and prisoners without. I think it's Madrid versus Gomez. And actually said the constitutional harm is, the risk is there for those who do have the disabilities and not for those who don't. They, they kind of got to that specific question, which is one of the questions we're talking about today. Um, but an additional, an additional factor that you can look at in qualified immunity analysis is the cruelty inherent in the practice. And I think the evidence that we've put forth shows that at the time this was happening, the defendants knew that this, this type of treatment of, you know, inmates with mental disabilities and mental health issues was unconstitutionally harmful. It was so harmful to someone like that who's very sensitive to those types of conditions. And they knew it, they, they knew it based on what? They knew it based on consensus in research, correction circles, um, the defendants themselves talked about it. I thought the record showed us that they, um, they had a plan. Maybe not a good plan. Um, and you keep talking about the, the, um, being just in solitary confinement. But I actually, when you read your complaint and your argument, I think that you're really more concerned with giving your client stimulus that he needs so that indeed one of the experts says, well, maybe he wouldn't do very well in the general population. But, um, so it seems to me, as you, as I'm sure you know, he goes in and out of solitary confinement. Sometimes there are things, they don't do such a good job, but this isn't a case, and we've had cases like this, where people are in solitary confinement for years. I mean, never out. No stimulus. Um, and you make the particular claim that, um, because of his disability, he really, he really needs special attention. And you get some support from that, from the fact that this facility is for people, as I understand. Is that right? That's, that's correct, Your Honor. This facility is held out to be the place in Virginia where they house inmates with mental disabilities or other mental health conditions. So, could you ever put somebody in solitary confinement who has autism? Your Honor, I, I think your earlier point about, you know, look at the whole concept of it. Like, I think there, I think you can argue that it's, it's permissible in limited situations to segregate somebody with autism, but there's a way to do that that does not exacerbate their disability and does not cause particular harm due to their sensitivities. And it's to the point, to your point about stimulus and making sure that they have opportunities to get real recreation as opposed to being in an outdoor cage, um, and other ways to deal with that. Because there is an argument, and I think the experts talked about that to some general population, and maybe it was to his benefit to keep him separate. But that's different than putting him in a small cell with little to no stimulus for 23 or more hours a day. This isn't a class action, right? That's correct, Your Honor. And was there, was there examination of how other people are treated? Your Honor, we, we, there was some discussion about it that we, we, we didn't get into how others were treated specifically, particularly because it's, it's exactly how they, this is, this case is about how Mr. Latson was treated. I'm sorry. Maybe if you put the microphone just a little away from me, because I think we're getting, no, away. Yeah. Now, now try talking. I didn't understand what you said. Your Honor, we, we, there was not specific inquiry into how other prisoners were treated, similarly situated or otherwise to Mr. Latson. We, we specifically discussed how Mr. Latson was treated in this case. Okay. Well, what do you want in the way of injunctive relief? We were not seeking injunctive relief. I thought you, you wanted injunctive relief and money damages, no? I think at the time, Mr. Latson is no longer incarcerated at Marion. Right. So I thought maybe you wanted us to mandate some principles or procedures that they had to follow, but you don't. I think a decision from this court could clearly establish some of the law regarding how to treat prisoners with mental disabilities with, with respect to segregation. So what we're, what we are pushing for is, is civil damages under 1983. When you said a decision from this court could establish these principles, I mean, I assume if we were to reach the merits of this claim, we would, we could, we could use this opportunity to sort of talk about principles for inmates with mental illness. And so I guess my question for you, just a very practical question is, you know, after this case was briefed and everything, and obviously after it was before the district court, we did issue this big decision in Porter v. Clark about solitary confinement. And would, might it not make sense just to let litigation proceed under Porter v. Clark as to how this standard should be applied? I, I think that's an, I think that's an acceptable approach. Of course, the challenge for Porter v. Clark here is that it doesn't factor into qualified immunity analysis because it came out well after. Right, right. No, it would not affect qualified immunity. Right. So, Your Honors, I know we're running short on time, even factoring in the technical difficulties. I wanted to spend a little bit of time on the second point regarding the knowledge of Director Clark. Your Honors, we've asked this court to consider whether there was sufficient evidence on the record for a fact finder to consider whether Director Clark had sufficient knowledge about the conditions of Mr. Latson's confinement at Rappahannock Regional Jail. This is the place where Mr. Latson was incarcerated prior to Marion. This is an important question because at the time Mr. Latson was at Rappahannock, he was considered a VDOC-responsible inmate, which meant that even though he was at a regional jail outside of the VDOC system, VDOC had ultimate responsibility for him. So, therefore, if Director Clark, the head of VDOC, knew about unconstitutional, unconstitutional conditions at Rappahannock and did nothing to move him or to prevent those conditions, he could be liable for those conditions. Admittedly, there's much to consider on that question regarding Director Clark's liability, but unfortunately, the district court addressed just one aspect of it, and it did so in a footnote on page 50 of the decision. In that footnote, the court said that he found that the record contains no evidence that Clark was aware of the details of Latson's confinement. In dispensing with that question in a footnote, the court ignored that there's material evidence on the record. And to describe it very briefly, Director Clark stated in an interrogatory response that he recalled having a 45-minute phone call with an advocate for Mr. Latson, Lisa Greenman, and that she described the conditions at Rappahannock and was requesting that Director Clark accept Mr. Latson early into VDOC. That indicates that they were having that conversation while Mr. Latson was still at Rappahannock. Director Clark also stated in his deposition that he recalled speaking with Ms. Greenman while Mr. Latson was at Rappahannock, and he recalled learning about some of the conditions at Rappahannock, including the fact that instead of a toilet, he had a hole in the floor in his cell. Did he talk about the timing of these calls? There was some discussion of timing. Director Clark, after the fact, issued a self-serving affidavit that... When you say there was some discussion, I mean, timing is important, right? Because ultimately, he was transferred. That's correct, Your Honor. There was discussion. Nobody could pinpoint the exact timing of the call. Isn't that a problem for you? It is a problem, although the fact that Director Clark acknowledged that Ms. Greenman was telling him about the conditions at Rappahannock indicates that that conversation was happening while Mr. Latson was at Rappahannock. Well, sure. I mean, he had to be there before he was transferred. The question is, as I understand your claim, is he waited too long to make that decision? Yes, and so the question then becomes, when did he know about what was happening? I mean, there's other evidence about VDOC officials discussing moving Mr. Latson as early as April 2014, and he was moved in June. And the conditions at Rappahannock were extremely bad, so even that difference of a couple of months could make a difference in holding Director Clark liable under the Eighth Amendment. Thank you very much. We did let you have a few extra minutes. And are people having trouble hearing? Because we're having trouble hearing the speakers. There's like an echo. There's an echo, so maybe you can pull it. Maybe your colleague can put the microphone a little further away. Can we try that out? Thank you very much. And I think he has a rebuttal time. Oh, it's dripping. I know. I'm not going to touch it. Thank you. Good morning. Normally, I don't have problems hearing me, so is this better? Is that better? Yes, if we can push it away from you. Okay, how's that? It's getting echoed. Is that better? Yes. Okay, good. We'll try that then. Okay. Good morning. May it please the Court. Oh, nice and loud. I can tell. Like me, a nice loud voice is going to be great. May it please the Court. Jeff Rosen on behalf of the appellees. Dealing with inmates with SMIs or significant mental illness is an issue that all prisons and local jails are dealing with nationwide. Marion Correctional Treatment Center was conscientiously and constitutionally addressing the needs of inmates with serious mental illness in 2014. Their facility was set up to specifically deal with inmates with SMIs and provide a therapeutic community with a goal of getting inmates into the general population. That was their treatment model. Marion assembled a treatment team for Mr. Latson from the first day he arrived there. It included a psychiatrist, a psychologist, clinical social worker, psychology associate, recreational therapist, psychiatric nurse, and corrections counselors. There was a lot of expert testimony, right, the plaintiff's experts and that DOJ expert. They disagreed. They thought there was a significant risk of serious harm in the way he was being treated. It was unreasonably punitive. It was out of step with what were then current standards of care for inmates with mental disabilities. I mean, this was all hotly disputed. Yes, but disagreement with the method of treatment does not create a constitutional violation, Your Honor, with respect. Through the use of segregation release plans, the inmates was gradually transitioned to the general population. In fact, Mr. Latson was at the end of his stay in the general population for more than a month and prior to that, two weeks. So the plan was working. They were able to transition him with the help of the mental health treatment team. Correctional officials cannot do it themselves. They need to rely, especially in inmates with SMI, on the mental health professional to say how is best to do it. Mr. Latson had autism. So he did not relate well to individuals. You just can't get him in a facility and put him in isolation.  At the facility? I think I believe there's a policy now that after 30 days in special housing that there is a review by the treatment team and by the warden to ensure that it's appropriate placement for an inmate at the facility. And that's a new procedure? I believe that's a new one, Your Honor. But at the time... You don't understand. It goes both ways. Sure, sure. No, I understand. I do understand that, but I was just asking. Because your position seems to be that we were entirely... Not just that we're entitled to qualified immunity, but that there is no constitutional violation and really no problem here. He got just exactly what he should have gotten. And I think it's hard to read the record quite that way. So that's why I was asking if, in fact, your clients read it that way. It would be an indication, if they've changed procedures, that maybe they thought there was room for improvement. Well, I know from the Port decision that now there is a policy that requires evaluation every 30 days for an inmate who's in restricted housing. And so I believe that is applicable to Marion as well. But Marion, the treatment team was always evaluating the needs of the inmate and regularly adjusting the... Didn't the district court say that toward the end of his longer periods of solitary confinement, it would be weeks before the treatment team met with him? Well, I think that the court may have said they met with him less frequently, but I would direct... I think it said a period of weeks, no? I would direct the court to Joint Appendix 284. That is a summary that we prepared. It's called... It's a timeline of all the treatment that he received and all the stimulation and all the things that was going on with Mr. Latson while he was marrying. The number of phone calls he had with his mother, the number of times he was let out of his cell, the number of times he was allowed to watch TV, how often he was allowed to socialize with other inmates. And so really, it shows that he was not isolated. He was not put in a... The district court found that there were stretches of time as long as 26 days in which he was not visited by any member of the treatment team. Is that something that you think is a disputed fact? Did the district court get that wrong? Well, Judge, I think that there was a voluminous material in the record of the 3,000... So that is a disputed fact, the district court misunderstood the record? No, it's not disputed, Judge. I don't think it's disputed. I would defer to the court's finding on that. Okay. I would defer to the court's finding on that. All I'm saying is that if you look at the timeline, you will see that he was not isolated. He had locked... He was out of his cell under the SRPs for great periods of time and... Excuse me? Not for the majority of time. No, not the majority of time. So a great is, you know... How long is he there? He's worked there for more than a year. Seven months. Seven months, Judge, I believe. Seven months? I believe he was there seven months, Judge. And so he was never in restricted housing for more than 55 days. And as I said, if you look at the timeline, he was allowed to call his mother from the very first week regularly. He had regular contact with her. We had a recreational therapist that brought him out of his cell and offered to play volleyball with him. We, you know, when he came out of his cell the first time to socialize with other inmates, his treatment team stayed there and watched the interaction. They were trying to take and not only protect him as well as protect the staff and the other inmates. And what about the music? Are inmates in restrictive housing allowed to have personal music players? There is music played in the hallways. Right, but what about personal music players? No, there are no plugs in the cells, Judge. There are no electric outlets in the cells. So there's no music players in the cells. I think at the end, after Mr. Latson was pardoned, they gave him his own wing and I think he had a music player that he was able to play music then. He was allowed out of his cell during his SRPs to watch television, among other things. He was able to watch TV. And he may have been able to listen to music when he was allowed out of his cell on the SRPs as well, Judge. But there are no outlets in the cells. So let me ask, so part of your argument, at least before the district court, you were arguing in the alternative that you prevail on the merits of the conditions of confinement claim and in large part because at that time in our circuit, you argued solitary confinement just didn't meet the objective prong. It wasn't a sufficiently severe deprivation for a condition of confinement claim. I mean, is that position still tenable after Porter v. Clark or is that now out of this case? Well, I think the facts of this case are different from Porter v. Clark. But just the question of whether solitary, we have now resolved, right, that solitary confinement is of the sort in Porter is sufficiently severe of a deprivation. Yes. And so you might still have arguments that these facts are different from the Porter facts. Yes. No, I think you've resolved that issue, Judge. And I think the evidence in this case was that the jail officials were aware that long term use of, I like to call it restrictive housing versus solitary confinement, could be detrimental to inmates. And they've recognized that. And that's why the treatment model is to take and get, to get the inmates at Marion from restrictive housing into the general population. So they are aware of that. And they did their best to take and try to transition him to general population. The facts in this case are far from the case relied on by the appellants to suggest that Mr. Latson's Eighth Amendment rights, proven in cruel and unusual punishment, were violated. He was never permanently signed to restrictive housing. His status changed from when he was initially being evaluated by the treatment team. He was initially evaluated. And he was placed in restrictive housing for that. Then he was put on SRPs to allow him out of his cell to really desensitize him so that he could take in socialized other inmates and go into the general population. But then when he was disciplined for assaulting a jail officer, attempting to hit him with a food tray, then he was put in disciplined housing. But before he was done that, he was evaluated by the treatment team to make sure he understood what he was doing, understood the process. And, in fact, he agreed to restrictive housing for 20 days. I think he was let out sooner than 20 days. And then he was transitioned into the general population successfully. So I think this model did work for Mr. Latson. And it appears that the appellants are complaining they didn't like the method in which we used, but the method was overseen by mental health professionals. And that's what jail officials have to rely on. Well, but as my colleague has mentioned to you, there are other mental health professionals who have filed their expert opinions to the contrary. So I don't know. Your argument strikes me as you're trying for us to say that this was clearly constitutional, which is really a step further than you need to go, right? You can rely on qualified immunity. Absolutely. If we should do them in seriatim and first determine whether there was a constitutional violation, you would prefer that? No, Your Honor. We would rather go to the second prong, as the lower court did, Judge. As the lower court did, he went to the second prong, the lower court. But you spent all your time here on the constitutional violation. So that's what made me think, well, maybe you wanted us to deal with that first. And more than a constitutional violation, you spent all your time here arguing not only that this was constitutional, but that this was just perfect. And that just, in light of the record, and even the district court's findings, that just seems like a position that you need not prevail on. Judge, I'm not suggesting that it was perfect. Obviously, we did the best we could. And we certainly were governed by the law that we were, what we believed the law was at the time. But from the case that recited, this was a case where they attempted to assemble a team of mental health professionals from the beginning of his incarceration to best oversee how he transitioned the general population. That's probably, in a prison setting, is the best we can ask for. Of course, as I said, it was a challenge that whether we used the best method. But we certainly used a method that was recognized. And we had a psychiatrist, a psychologist, overseeing his transition and the treatment. So I think— Mr. Rosen, as part of that sort of analysis, your opponent over here in his papers, as seemed to suggest that counter, as a counter to the notion that everything, as Judge Motz indicated, was peachy, that there was some evidence of mistreatment on behalf of the guards at the facility. What are we to make of that allegation? First of all, is there evidence to support that? And second, does that cut against the notion of whether or not this was, in fact, objectively satisfactory treatment? As I recall, Judge, I think there's some testimony of Mr. Latson that the guards were pushing him, I think. And, of course, he did have— Well, there was also some evidence, I think, that they were verbally assaulting him, making fun of his mental disability and the like. Do you recall that? There was some evidence of that, Judge. And I don't think there's any evidence, any other evidence of that. I know that there were several disappointing actions taken against him. And, of course, he was noted to have a high aggression level, specifically with law enforcement and prison officers. He was in jail for assaulting a police officer. That was his convicted event. And in Rappahannock, he also was convicted of a misdemeanor assault of a jail official. So I think there was— Was that the first one? Was that the time when he was waiting outside the library for it to open and someone phoned the police and said there was a kid with a hoodie outside of the library, and so the police came to try to arrest him? Yes, Judge. Yes, Judge. And I think, I believe, if my memory serves me correct, I think Mr. Latson may have broke the officer's arm or leg, I think, in that case, I believe. It was a significant assault, I believe. So there was some evidence, some history of his aggression level. And so I think that that was taken into consideration as well in determining how to best handle Mr. Latson. And so I think that was— Did people on his treatment team have expertise in his particular condition? I can't remember. Yes, two of them did, I think. I thought there was one of them who— I think Madsen, I think Ms. Madsen, the psychologist, had dealt with—Dr. McGrady had dealt with him as children, because that's really generally when autism is diagnosed as a child, and most commonly handled by a child psychologist. Dr. McGrady had experience. And Dr. Horst, the psychiatrist, also had some experience as well. I thought some witness testified that—I thought it was a she, but I could be wrong—that she was the only person around that had experience. I'm just remembering the record. I think that being Dr. McGrady, but I believe that Dr. Horst also said, the psychiatrist said that she had some experience in her training as well, dealing with autistic patients. We can't read the record. So I did want the appellants to omit any reference to Mr. Latson's risk of aggression assessments. They don't mention that at all. They don't want to consider that. But I do think that the mental health treatment team considered his diagnosis, history of violence for law enforcement, and low frustration tolerance level, and classified him accordingly and tried to use that to take and get him indoctrinated into the general population. Can I ask you just sort of a procedural question about this lawsuit? So we did hold in Porter v. Clark that even solitary confinement, or as you would call it, restrictive housing, can be justified, that there's sort of a justification prong at issue in these conditions of confinement cases. But I didn't see that you actually argued justification in your summary judgment papers before the district court. I understood your argument to be, one, under sort of Fourth Circuit case law, this just does not—it's not sufficiently severe to trigger a conditions of confinement claim. And two, there was no deliberate disregard because we were trying to get him into the population and everything. But you didn't actually argue, look, if we're wrong about that, it's justified because he had this history of aggression and he needed to be segregated. So why are we arguing about that now, I guess, is my question. Well, I thought that was—I thought we included that in our brief, the fact that the treatment team considered his history of aggression in determining how to handle that. Was it an argument before the district court? Yes. Did you think you argued the justifications? I believe—I thought we had. I believe we did because all along our theme has been that you have to take him as he comes to evaluate, and to evaluate him, that's what we did. If he was not autistic and didn't have the high aggression level, he would have been treated on a different segregation release plan than he was treated. So I do think that we considered that. But I do believe that, you know, prison officials cannot oversee mentally ill individuals without consideration by mental health professionals. In this case, that's what we're relying on. And that may have been a distinction in the Porter case. This is not Porter. Because in this case, we really did have—in Porter, the inmates were housed in segregation because they were on death row because of their conviction. But here, he was housed in restricted housing after evaluation and determination. That's the best place for him by mental health professionals. And I think that prison officials have to rely on mental health professionals in determining how to treat inmates with mental health illness in prison. That's a problem that they have. And that's what we need to do. Can I just ask you a very quick question about this evidentiary issue before your time is up, and about the phone call, and what a reasonable jury could infer from that? The phone call was 45 minutes long. Is that right? Yes, Judge, and— Let me just— So my question is, why couldn't a reasonable jury infer from a 45-minute-long phone call in which someone is complaining about prison conditions that those conditions would have been discussed? Well, Ms. Greenman could not remember the contents of the conversation in her deposition. But they knew that it was about, I want to transfer because the conditions are bad. She could not remember when it happened, what was— I'm just asking, one of the arguments is that there's no specific information about what exactly he was told about the conditions. And so my only question is, could a reasonable jury infer from the fact that the conversation was 45 minutes long that a lot of details would have come out? What else were they talking about for 45 minutes? I don't believe so. I think Director Clark said that Ms. Greenman was talking about her own autistic child, and it went on for a long period of time. Director Clark only recollected that all she said was about the conditions were that they were not good and that he had one in his cell, a toilet, was a hole in the floor. That's the only evidence. There was no evidence from Latson. He couldn't remember what had happened or what the conditions were there. And so the judge found there was no dispute, material disputes, to fact, on that issue. And that was—and as I said, there was no evidence. And Ms. Greenman could not put on evidence—did not put on evidence, and the appellants did not put on any evidence on that issue. So for those reasons, I would respectfully ask the court to affirm the district court's decision, granting appellees motion for summary judgment. Thank you. Thank you very much. Mr. Williams, do you have a rebuttal? Trying to get some distance to the microphone this time. Just leave it back to me on how that works. Your Honor, the appellees make a lot—they spend a lot of time talking about specifically kind of what treatment Mr. Latson was given and when. And a lot of that comes down to factual dispute in terms of the extent of what he received. But the bottom line is that Mr. Latson—and this is undisputed—spent 180 or more days—just over 180 days in solitary confinement.  Mr. Latson's treatment team—the record has internal emails where I think it was Dr. McGrady acknowledged that she was really the only person on the team with any experience in autism. And there's some acknowledgement that they just really weren't sure what to do with someone with autism. You know, I guess the problem with that sort of broad statement about the number of days he spent in solitary confinement or restricted housing isn't all that helpful without some context as to the reasons why. Yes, I think the context is an important question. Again, our position is that even—the reasons that he was placed in solitary confinement in these different instances were kind of self-fulfilling prophecy in terms of how he was treated and how his disabilities were not taken into account for his housing decisions. You know, one of the other things—and I don't know that this is necessarily competent evidence—but as I understand this record, your client's case somehow came to the attention of the governor. There was some media attention that was focused on his case. That would seem to suggest that, if anything, prison officials were very, very attuned to the fact that your client needed to be treated—you know, all prisoners should be treated humanely, but even more so this particular prisoner because of the attention that had been focused on him. So how are we, if at all, supposed to factor that in? I believe a lot of the attention came late in Mr. Ladson's confinement, and there was a big push for the governor to pardon Mr. Ladson, which he ultimately received a conditional pardon. So I don't think that needs—that should be factored in in terms of considering whether, you know, the amount of attention that the defendants were paying to Mr. Ladson because a lot of the— Was it closer to their subjective state of mind? I don't think it does, given that a lot of this publicity was coming out later. So I think even if one were to argue that they were spending—you know, paying more close attention to him later on in the—later on in his incarceration, that doesn't impact the majority of his incarceration, both at Rappahannock, which is a separate issue, but even specifically at Marion because the publicity didn't really come out until later on in his incarceration. Your colleague said he was there for seven months. I'm sorry, Your Honor? Your colleague said in his argument that your client was there for seven months. Is that correct? Yes, I believe he was there— And you just told us that he spent 180 days in solitary confinement? Yes, Your Honor. And if you divide that into 30-day months, that's six months. Six-sevenths of the time, he's in solitary confinement. Yes, Your Honor. The solitary, admittedly, was broken up in periods at different—you know, he wasn't in for six months straight, but he was in a total of 100—I believe it was 100 days. And there were much shorter periods, going to your point about the end. There were longer periods of solitary confinement, of being deprived of other stimuli in the beginning, and towards the end, there were just much longer periods of out of solitary confinement, right? Yes, Your Honor. I want to, right before I run out of time, make one last point. There was a discussion earlier about the Booker holding. I believe, Judge Harris, you brought up Booker in terms of using unpublished opinions on clearly established. Respectfully, Booker holds that unpublished opinions cannot be considered in deciding whether a particular conduct violated clearly established law. In Booker, two of the cases that the court held it could not consider were actually being put forward to show that the right at issue was not clearly established. I believe it was Cameron and the Day case. So, I think Booker does get to, when you're considering clearly established on both sides, I think you need to put aside unpublished opinions. And one other, just one other point I want to make is that, you know, Your Honor, there were multiple experts and multiple individuals who put forth information to these defendants about how, what they were doing and the way they were treating Mr. Latson was harmful. And I want to specifically point out Dr. Rojan, who was a third party brought in by the Department of Justice to evaluate Mr. Latson while he was at Marion. Dr. Rojan's report is at JA 1156. And he reached conclusions that, you know, this was a cyclical process where Mr. Latson was being harmed and then it was leading to outbursts and then he was being segregated again. And Dr. Rojan, who was an independent third party brought in, specifically drew conclusions that the way that the segregation was set up for Mr. Latson was harmful. And this is, this is evaluation that was happening at the time Mr. Latson was there that can show, that helps show that at the time the practice that these, the way that these defendants were treating Mr. Latson was in and itself cruel and should have been obvious to anybody. Thank you very much. We will come down and greet the lawyers and then go directly to our next case. And so the next group of lawyers can come up.
judges: Diana Gribbon Motz, Albert Diaz, Pamela A. Harris